MUSIL, Plaintiff and Respondent, v. BARRON ELECTRICAL CO-OPERATIVE, Defendant and Appellant: SEARS, ROE-BUCK & COMPANY, Interpleaded Defendant and Respondent.*

*March 9—April 4, 1961.*

* Motion for rehearing denied, with $25 costs, on June 6, 1961.

For the appellant there was a brief by *Cameron, Cameron & Shervey* of Rice Lake, attorneys, and *Arthur Wickham*

of Milwaukee of counsel, and oral argument by *Mr. William A. Cameron* and *Mr. Wickham.*

For the respondent Allen Musil there was a brief by *Gannon & Gannon* of Rice Lake, and *Doar & Knowles* of New Richmond, and oral argument by *W. T. Doar, Jr.,* and *Patrick G. Gannon.*

For the respondent Sears, Roebuck & Company there was a brief and oral argument by *Donald L. Farr* of Eau Claire.

DIETERICH, J.   Allen Musil and Velma were married in 1951. They were living on an 80-acre farm owned by Allen's father. They worked the farm and Allen also did outside work. The deceased, Velma, was twenty-eight years of age on June 4, 1958, the day she was electrocuted. She did the work of a farm woman, doing the housework, working in the fields, and in the barn. They had four children, two boys, age six and four, two girls, age three and two.

In 1939, the defendant Barron Electrical Co-operative constructed an electric power line past the Musil farm and hooked up the Musil buildings for electricity. Before the line was connected by the Co-operative, Musil's father hired two electricians to wire the house and other buildings. These men installed the electric meter-socket box on the east side of the house and extended the cable up from the meter-socket box to the weatherhead leaving three wires to be connected to the Co-operative's service wires coming in from the road.

The Co-operative extended its three wires from the pole near the road where the transformer is located to the service pole some distance from the house, and from the service pole to the three house knobs it had installed on the side of the house. These wires were connected by the Co-operative to the wires leading through the weatherhead.

The drip-loop connections were made by the Co-operative at a height of between eight and nine feet from the ground. The three connectors were left bare by the Co-operative.

See plaintiff's Exhibit 14 reproduced herewith. One wire was bare and exposed for a distance of one and five-eights inches, another, one and three-fourths inches, and the third was bare and exposed for a distance of two inches. All the

rest of the wires in both directions from the connectors were wrapped, taped, and insulated. The meter was read regularly by employees of the Co-operative until the mid-1940's. Thereafter, a self-reading system was commenced.

In 1956, the plaintiff purchased a television set and Sears, Roebuck & Company installed an antenna which was 40 feet in height. The home was equipped with lightning rods which were connected to either one or two grounds. The employee of Sears connected the base of the tower to the lightning-rod cable by wrapping an aluminum wire around the bottom of the tower and winding it around the lightning-rod cable.

On June 4, 1958, there was a severe windstorm accompanied by rain in the area of the Musil farm, which knocked down power lines, blew shingles off the barn, took down a tree in the neighbor's yard, and smashed the corncrib. The aerial or TV antenna on the Musil farmhouse was broken about 10 feet above the point where it was attached to the roof and the mast tipped over the edge of the roof into the vicinity of where the bare drip-loop connectors were installed by the Co-operative. Various guy wires which had been supporting the aerial were lying over the edge of the house in close proximity to the ground.

After the storm, the deceased, Velma Musil, went out on the roadway and had a conversation with her neighbor. Subsequently Mrs. Musil's body was discovered by her children, the husband was not at home, and when witnesses arrived she was lying on her back with a guy wire in both hands, having been electrocuted.

Madeline Schlote, called as a witness on behalf of the Barron Electrical Co-operative, testified that she lived on the first farm south of the Musil farm. She knew Mrs. Musil in her lifetime. The last time Madeline Schlote talked to Mrs. Musil was just a few minutes before she was elec-

trocuted. The conversation took place on the road halfway between their homes. Mrs. Musil informed her that the TV tower had blown down, that it was over the bedroom window and that it looked spooky.

The testimony of Reverend Benedict Bauer is that he was the pastor at Holy Trinity Church for the past eighteen years, that he knew the Musil family, and that she was a member of his church. He was called to the Musil home on the night of June 4, 1958, and when he arrived at the farm home Mrs. Musil was dead. She was lying near the window.

The abridged testimony of Carl H. Westerlund, who resides at Sarona, with twenty years of experience as an electrician, is:

"I received a call to go to the Musil home about 9 o'clock. Mrs. Musil was lying on the lawn approximately 10 feet from the house with her feet toward the wall of the house and with one guy wire grasped in her hand. She was on her back. She was at a slight angle to the building and her feet were about in line where the meter would be on the building. The aerial was broken and bent over so that the top part with the prongs was hanging over the eaves. The nearest ones were about four feet off the ground or close to that. They were pretty much horizontal. The top horizontal prong after the TV tower had tipped over became the bottom horizontal prong which was about four feet off the ground and continued up toward the eave of the roof. I wrapped a blanket around the wire so I could make a loop out of the blanket. I think the end of the wire was probably between two and four feet from where she had them grasped. I pulled back only about four feet before I pulled the wires out of her hands. The purpose of the blanket was to get something that was not a conductor. The blanket is a material that could not carry electricity. It is a type of insulator. The lights were on when I got there. I could not tell whether or not the wire that was in Mrs. Musil's hand was hot or not at that time. I remember distinctly that the north parallel spokes on this antenna were across the window because the lights were on in the house and that stands out

distinctly. I did not observe whether there were any bare connections in the meter loop at the house that night. I went back several days later. There was no insulation on the wire for about an inch at the point where the bare connectors were fastened at the junction and connection of the service wires to the wires extending from the weatherhead."

Frank A. Havel, a registered professional land surveyor, testified on behalf of the plaintiff that he went to the Musil farm on June 11th to make certain measurements, and they were made of the location of the weatherhead, meter loop, the service entrance to the house, service-entrance pole, the location of the base of the TV tower, the location of the respective anchors related to the TV tower, the dimensions of the house, the location of it, and whatever pertained to the location of the service entrance. He testified that the weatherhead was nine and six-tenths feet above the ground, the meter was five and four-tenths feet above the ground and the meter loop, consisting of the meter itself, the meter connection and the service-entrance cable on the weather-head which consisted of the three projecting wires for the purpose of connecting onto the service-entrance head from the Co-operative. That the height from the ground of the bottom connectors was eight and four-tenths feet, the center connector was eight and eight-tenths feet, and the top connector was nine and two-tenths feet above the ground. The bottom wire was exposed for one and five-eights inches, the center wire was exposed for one and three-quarter inches, and the top wire, which in this case was neutral, was exposed two inches.

The testimony of Dr. William B. Rydell is that he was called to the home on June 4, 1958. Mrs. Musil was lying in the yard on her back. She was dead. He further stated that he assumed her death was due to electrocution. There was nothing to warrant a contrary assumption. He further stated in his testimony that she was lying about even with

the bedroom window and she had a wire in both hands. The body was not moved before the electrician got there.

The trial court submitted the following special verdict:

"1. At and before the accident in question, was the Barron Electrical Co-op negligent in installing the electric service to the Musil home in any of the following respects?

"(a) As to the height of the wires above the ground at the point of attachment to the buildings?

"Answer: Yes.

"(b) As to the insulating covering on the connectors and wires adjacent thereto?

"Answer: Yes.

"2. If you answer question 1 or any subdivision thereof, 'Yes,' then answer the corresponding subdivision of this question:

"Was the negligence so found by you in answering question 1, a cause of the accident in any of the following respects:

"(a) As to the height of the wires above the ground at the point of attachment to the building?

"Answer: Yes.

"(b) As to the insulating covering on the connectors and wires adjacent thereto?

"Answer: Yes.

"3. Was Sears, Roebuck & Company negligent in not permanently and effectively grounding the metal structure supporting the TV antenna at the Musil house?

"Answer: No.

"4. . . .

"5. What are the damages sustained by Allen Musil on account of the death of his wife?

"(a) For funeral expenses?

"(Answered by the Court.) $1,090.

"(b) For pecuniary loss?

"Answer: $22,500.

"(c) For loss of society and companionship?

"Answer: $3,500."

After reducing the amount of the loss of society and companionship to the statutory maximum, judgment was en-

tered in favor of the plaintiff and against the Barron Electrical Co-operative.

The defendant, Barron Electrical Co-operative contends: (1) That any negligence of the defendant Co-operative could not be causal because of a superseding cause; (2) that the court should have answered question 3 "Yes," as a matter of law; (3) that there was no proper showing that the defendant Co-operative failed to exercise ordinary care, and (4) that the court abused its discretion in failing to admit the testimony of the eight-year-old son, David Musil.

Pursuant to sec. 167.16 (1), Stats. 1937,[1] the Co-operative, a Wisconsin utility corporation, is a person within the meaning of this section and therefore required to comply with the Wisconsin state electrical code.

Sec. 370.01 (30), Stats. 1937,[2] the word "person" shall extend and apply to bodies corporate unless plainly inapplicable.

The Co-operative has contended on appeal that sec. 196.74, Stats. 1937,[3] did not authorize the public service commission to issue an electrical code which would apply to wires

---

[1] "It is hereby made the duty of every contractor and other person who does any electric wiring in this state to comply with the Wisconsin state electrical code, and the company furnishing the electric current shall obtain proof of such compliance before furnishing such service; . . ."

[2] "The word 'person' shall extend and be applied to bodies corporate unless plainly inapplicable."

[3] "Every public utility and every railroad which owns, operates, manages, or controls along or across any public or private way any wires over which electricity or messages are transmitted shall construct, operate, and maintain such wires and the equipment used in connection therewith in a reasonably adequate and safe manner and so as not to unreasonably interfere with the service furnished by other public utilities or railroads. The public service commission is authorized to issue orders or rules, after hearing, requiring electric construction and operating of such wires and equipment to be safe and may revise these orders or rules from time to time as may be required to promote public safety."

which are not "along or across any public or private way."
This argument was not made before the circuit court. It
overlooks the provision of sec. 167.16 (1) previously re-
ferred to, in which the legislature recognizes that the code
is applicable to all electrical wiring.

The Wisconsin electrical code as revised in 1934, and
which was in effect in 1939, provides as follows:

Order 1301.01. *General.*

"c. Overhead service wires and cables shall be as high
above ground at the point of attachment to a building as
the height and form of the building and existing local con-
ditions permit, but shall in no case be less than 10 feet and
need not be greater than 18 feet unless in the judgment of
the inspection department a greater height is required in a
particular case to secure proper clearance from other wires
or obstructions."

Order 1302.03. *Wire terminals, splices, and joints.*

"b. Wires shall be so spliced or joined as to be mechani-
cally and electrically secure without solder. The joints shall
then be soldered with a fusible metal or alloy unless made
with a splicing device and shall be covered with an insula-
tion equal to that on the wires. . . .

"d. Ends and joints of insulated conductors, unless other-
wise adequately guarded, shall have equal insulating cover-
ing with other portions of the conductor, and this covering
shall be securely held in place."

Order 1304.02. *From main to building, overhead.*

"a. Approved weatherproof or approved rubber covering
shall be employed on single conductors, and approved rubber
insulation between conductors on multiple-conductor cables,
used as service drops. Wires shall not be smaller than No.
10 if of soft copper, or smaller than No. 12 if of medium or
hard-drawn copper.

"b. Wires or cables shall not approach nearer than eight
feet to buildings over which they pass, and, if attached to
roofs thereof, shall be supported on substantial structures.

"c. When service conductors from overhead supply wires are carried underground, the portion of the wires underground and running up the pole to a point at least eight feet above the ground shall be suitably protected from mechanical injury and shall be protected from moisture by a covering of lead or other means approved for the purpose.

"d. Multiple-conductor cables used for service drops shall, at the point of attachment to the building, be kept at least six inches from adjacent woodwork and at least 12 inches from overhanging projections of combustible material, unless fittings approved for the purpose are used."

Order 1304.03. *On exterior of building, overhead.*

"a. Wires or cables which are liable to contact with awnings, swinging signs, shutters, or other movable objects, shall be inclosed in approved conduit or electrical metallic tubing. All such systems on exteriors of buildings shall be made raintight.

"b. Open wires shall not be within eight feet from the ground, shall not be readily accessible and shall not be subject to mechanical disturbance. If exposed to the weather, they shall be supported on approved insulators, racks, brackets, or other supports approved for the purpose. Such supports shall be placed at intervals not exceeding nine feet and shall separate the wires at least six inches from each other and at least two inches from the surface wired over; provided, however, that supports may be placed at intervals not exceeding 15 feet if they hold the wires at least 12 inches apart. Open wires if not exposed to the weather, may be supported on glass or porcelain knobs placed at intervals not exceeding four and one-half feet and maintaining the wires at least one inch from the surface wired over.

"c. Multiple-conductor cables run on the exterior of building walls, unless especially approved for the purpose shall not be within eight feet from the ground, shall not be readily accessible and shall not be subject to mechanical disturbance. They shall be supported at intervals not exceeding 15 feet. Unless provided with a lead sheath or with armor, they shall be mounted upon insulating supports so as to be separated at least two inches from the surface wired over.

"d. Open wires on exterior of buildings shall have approved rubber or weatherproof coverings for single wires

and approved rubber insulation between conductors for multiple-conductor cables.

"e. Rigid steel conduit or electrical metallic tubing made raintight, or multiple-conductor cable approved for the purpose, shall be used for wiring on exterior of buildings whereever open wiring cannot comply with the requirements of this order, and may be used in lieu of such open wiring under any conditions. For voltages exceeding 600, see Order 1350.02."

John E. Wise testified on behalf of the plaintiff. He has been an electrical engineer with the industrial commission since 1926, and has worked with electrical-safety problems. He testified that the required clearance under the code shall be at least 10 feet and if the conductors go over a highway it must be more, but that the clearance over the yard or lawn should be at least 10 feet. He further testified that the code requires that the splices or joints should be properly insulated, but that it was not necessary to insulate the grounded conductor which was the top wire, and that they should have been properly taped and provided with a covering of other material besides tape. He testified that the general requirement is that the service drop be maintained high enough to provide the clearance that is mentioned in the code, and that it is a requirement of the code that the joints be properly insulated, and in order for the service drop to be properly insulated it must be so insulated for the complete length and not only when you get to the line conductors.

The Co-operative failed to comply with applicable code requirements and was properly found to have been negligent.

The Co-operative next contends that the court should have found as a matter of law that Sears, Roebuck & Company was negligent in not properly grounding the TV antenna.

Mr. Wise, in his testimony in connection with the installation of the antenna, stated that under the provisions of the

1951 revised code there is a provision for the bonding of a metal radio mast to the nearest lightning conductor and that provision is under Order 1618 and provides: *"Metal radio masts on buildings.* Metal radio masts on buildings shall be bonded to the nearest lightning conductor," and in order to have them bonded to the nearest lightning conductor, a copper conductor should be carried from the radio mast to the conductor that runs down from the lightning-rod conductor which comes down from the point on the top of the building to the ground. He further testified that the antenna was connected or bonded to the conductor on the lightning system and that the lightning system was grounded in two places in this system, and this met the requirements of the code.

We find no basis upon which the defendant Sears, Roebuck & Company could be found as a matter of law to be negligent. It follows that the judgment properly dismissed the complaint and cross complaint as to them.

The Co-operative claims that it should not be held liable in any event because there were three intervening and superseding causes which intervened between the date of installation and Mrs. Musil's death. These three alleged causes were: (1) The erection of a TV antenna which was not contemplated at the time of the original installation; (2) the violent windstorm, which blew down the TV tower; and (3) the act of Mrs. Musil in grasping an uninsulated wire when standing upon wet ground with wet shoes.

The danger incident to the use of electricity is imminent and lurking in character and a high degree of watchfulness for the prevention of accidents is imposed upon persons or corporations engaged in transmitting electric current. The watchfulness required of such persons or corporations so as to prevent accidents should take into account the acts of strangers and the public generally. *Wilbert v. Sheboygan*

*Light, Power & R. Co.* (1906), 129 Wis. 1, 106 N. W. 1058, and *Sweenor v. Superior Mfg. Co.* (1911), 147 Wis. 1, 132 N. W. 607.

In applying the test under Restatement, 2 Torts, p. 1188, sec. 442, of intervening cause to the evidence and facts in this case, we do not find the alleged involved acts were extraordinary or outside the normally anticipated events. We find no legal basis which would or could constitute an intervening and superseding cause so as to prevent the negligent installation of the energizing wires from constituting a legal cause of the electrocution of Mrs. Musil.

The defendants further contend that the trial court abused its discretion in rejecting the testimony of the son of the deceased who was at the time of the accident a little over six years of age and attending the first grade in school. At the time of the trial the boy was a few months short of being nine years of age. The trial court was of the opinion that the boy did not have mental capacity to testify. The plaintiff contends that sec. 325.30, Stats.,[4] applies.

David Musil was examined by the court. The following questions and answers were given:

"*Q.* How old are you, David? *A.* Eight.

"*Q.* When is your birthday? *A.* September 6th.

"*Q.* September 6th. Do you go to school? *A.* Yes.

"*Q.* What grade are you in? *A.* Third.

"*Q.* And when did you start school? How long ago? *A.* I can't remember.

"*Q.* You can't remember? Were you going to school in June of 1958, when your mother was hurt. *A.* Yes.

"*Q.* Was it kindergarten? *A.* First grade.

"*Q.* First grade? *A.* Yes.

"*Q.* How long had you been in the first grade then? *A.* I can't remember.

---

[4] "Capacity to testify. The court may examine a person produced as a witness to ascertain his capacity and whether he understands the nature and obligations of an oath."

"*Q.* You can't remember? . . . you can't remember how long you were going to school in September of 1958? *A.* No.

"*Q.* Whether a month or a year? *A.* No.

"*Q.* You don't know? *A.* No.

"*Q.* Do you remember your mother passed away? *A.* No.

"*Q.* You don't remember?

"Mr. Cameron: I don't think he knows the word, 'passed away.'

"*Q.* When she died? *A.* No.

"*Q.* You know your mother is dead? *A.* No.

"*Q.* You don't? *A.* Yes.

"*Q.* You don't remember when she died? *A.* No.

"*Q.* Do you remember many of the things she said to you? *A.* I remember one thing. 'Don't go near the tower, or try to drag it away or else we will get killed.'

"*Q.* Is that the only thing you remember? *A.* Yes.

"*Q.* That she said to you? *A.* Yes.

"*Q.* That is the only thing? *A.* Yes.

"The Court: Well the court is of the opinion, with this boy's recollection, that is the only thing he can remember. I don't think he would be competent as a witness.

"Mr. Cameron: Well, the defendant wishes to take an objection to the court's ruling on that matter.

"The Court: I think the boy, at that age, he would have been six then, in view of the fact that he doesn't remember when his mother died . . . He doesn't remember when his mother died. He doesn't remember anything she said to him except this one thing. Now, what caused that to be implanted in his memory? I don't think the sufficiency of his recollection is such that he should be required to testify, and I do not think he should be a competent witness, and I don't think at this time, the lawyers should cross-examine him because I imagine he would say almost anything. You ask him a leading question, he would say almost anything that you want him to say.

"Mr. Cameron: I did not mean any cross-examination. I wanted to ask him a few questions to test his recollection as to other events that evening.

"The Court: *Q.* Do you remember anything else about what happened the night your mother died? *A.* No.

"*Q*. Just that she died? *A*. Yes.

"*Q*. That is all you remember? *A*. Yes.

"*Q*. Did you remember the TV aerial blowing down? *A*. Yes.

"*Q*. And then your mother went out and she died? *A*. Not right away.

"*Q*. Well, she went out sometime afterwards? *A*. Yes.

"*Q*. That is the only thing you remember? *A*. Yes.

"*Q*. You don't remember anything she said except this one statement, not to touch the wires or something to that effect? *A*. Yes.

"Mr. Cameron: Will the court inquire of him if he remembers his mother going out to the road to talk to the neighbor woman?

"The Court: *Q*. Do you know when your mother went out to the road that night to talk to the neighbor woman? *A*. She did.

"*Q*. When? Before the TV fell down? *A*. No, after. Before she died.

"*Q*. Before she died.

"The Court: I still don't think this boy is competent as a witness and that is the ruling of the court."

The true test of a child's competency to testify is his ability to receive accurate impressions of the facts to which his testimony relates and to relate truly the impressions received. If he has this understanding and intelligence and appreciates the obligation to speak the truth, he is competent. *Barnard v. State* (1894), 88 Wis. 656, 60 N. W. 1058; *Van Salvellergh v. Green Bay Traction Co.* (1907), 132 Wis. 166, 111 N. W. 1120; 28 R. C. L., Witnesses, p. 461, sec. 48; *DeGroot v. Van Akkeren* (1937), 225 Wis. 105, 273 N. W. 725.

The trial court could properly find from the testimony of the infant witness in this case that he did not have the capacity to understand questions put to him so as to enable him to frame and express intelligent answers. 1 Wigmore, Evidence (2d ed.), pp. 922, 923, secs. 505, 506.

We find no error on the part of the trial court in excluding the testimony of David Musil. In any event, the boy's testimony would go only to prove contributory negligence on the part of Mrs. Musil. Her contributory negligence not having been pleaded, it was not before the court. *Kennedy-Ingalls Corp. v. Meissner* (1960), 11 Wis. (2d) 371, 105 N. W. (2d) 748.

There being credible evidence to sustain the verdict of the jury, the judgment is affirmed.

*By the Court.*—Judgment affirmed.